[Cite as *State v. Nelson*, 2017-Ohio-5568.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 104336**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## STEVEN A. NELSON

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED IN PART;
VACATED IN PART

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-598804-A

**BEFORE:** Celebrezze, J., Kilbane, P.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** June 29, 2017

**ATTORNEY FOR APPELLANT**

Kevin M. Cafferkey
55 Public Square
2100 Illuminating Building
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:    Adam M. Chaloupka
          Mahmoud S. Awadallah
          T. Allan Regas
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

FRANK D. CELEBREZZE, JR., J.:

{¶1} Defendant-appellant, Steven Nelson ("Nelson"), brings this appeal challenging his convictions and the trial court's sentence for aggravated murder, murder, aggravated robbery, felonious assault, kidnapping, attempted murder, and having weapons while under disability. Specifically, Nelson argues that his convictions are not supported by sufficient evidence and against the manifest weight of the evidence, his trial counsel provided ineffective assistance, an in-court identification violated his right to due process and a fair trial, and the trial court erred in imposing consecutive sentences. After a thorough review of the record and law, we vacate Nelson's conviction for aggravated murder in violation of R.C. 2903.01(A), and affirm the remaining convictions and the trial court's sentence.

## I. Factual and Procedural History

{¶2} The instant appeal arose from a robbery and shooting that occurred on August 29, 2015, near the intersection of Lakeview Road and Parklawn Drive on Cleveland's east side. The victims, Darien Leadbetter ("Leadbetter") and Leonard Goins, IV, ("Goins"), were walking to a gas station and observed a male on a bicycle — later identified as Nelson — following them. Nelson caught up to Leadbetter and Goins, dismounted the bicycle, pointed a gun at them, and ordered them to turn over their belongings. Goins, a concealed carry permit holder, drew his gun and pointed it at Nelson. Goins and Nelson exchanged fire, and Leadbetter insisted that Nelson fired his

weapon first.

{¶3} Both Goins and Nelson sustained gunshot wounds during the exchange. Goins fell to the ground after suffering a gunshot wound to the head from which he died. Nelson suffered a gunshot wound to his right foot. Nelson began to flee from the area, but returned and began shooting at Leadbetter. Leadbetter called 911 to report the incident and then ran home.

{¶4} Nelson received treatment for his gunshot wound at University Hospitals.[1] Thereafter, he spoke with homicide detectives and alleged that he had been shot during a drive-by shooting. Officers determined that Nelson's account of the incident was inconsistent with the evidence collected from the crime scene. As a result, officers arrested Nelson in connection with the shooting.

{¶5} On September 24, 2015, the Cuyahoga County Grand Jury returned a 15-count indictment charging Nelson with (1) aggravated murder, in violation of R.C. 2903.01(A); (2) aggravated murder, in violation of R.C. 2903.01(B); (3) murder, in violation of R.C. 2903.02(B); (4) aggravated robbery, in violation of R.C. 2911.01(A)(1); (5) aggravated robbery, in violation of R.C. 2911.01(A)(3); (6) felonious assault, in violation of R.C. 2903.11(A)(1); (7) felonious assault, in violation of R.C. 2903.11(A)(2); (8) kidnapping, in violation of R.C. 2905.01(A)(2); (9) attempted murder, in violation of R.C. 2923.02/2903.02(A); (10) aggravated robbery, in violation of R.C. 2911.01(A)(1);

---

[1] The hospital is approximately two and one-half miles from the location where the shooting occurred.

(11) aggravated robbery, in violation of R.C. 2911.01(A)(3); (12) felonious assault, in violation of R.C. 2903.11(A)(2); (13) kidnapping, in violation of R.C. 2905.01(A)(2); (14) having weapons while under disability, in violation of R.C. 2923.13(A)(2); and (15) discharge of a firearm on or near prohibited premises, in violation of R.C. 2923.162(A)(3). Counts 1 through 13 contained one- and three-year firearm specifications and notice of prior conviction specifications. Nelson pled not guilty to the indictment.

{¶6} Nelson waived his right to a jury trial. A bench trial commenced on March 21, 2016. At the close of the state's case, Nelson moved for a Crim.R. 29 judgment of acquittal. The trial court granted the motion as to Count 15, the discharge of a firearm on or near prohibited premises; the trial court denied the motion with respect to the remaining counts in the indictment. The defense did not call any witnesses. Nelson renewed his Crim.R. 29 motion for a judgment of acquittal at the close of all the evidence. The trial court denied the motion.

{¶7} On March 24, 2016, at the close of trial, the trial court found Nelson guilty of the remaining 14 counts in the indictment and the underlying specifications. The trial court immediately proceeded to sentencing.

{¶8} The trial court heard from the prosecutor, defense counsel, Nelson, Leadbetter, and several of Goins's family members, including Goins's father, mother, stepmother, fiancée, sisters, and aunt. The trial court merged Counts 1, 2, 3, 6, and 7; Counts 4, 5, and 8; Counts 9 and 12; and Counts 10, 11, and 13 for sentencing purposes.

The state elected to sentence Nelson on Counts 2, 4, 9, and 10. Furthermore, the trial court merged the one- and three-year firearm specifications charged in Counts 2, 4, 9, and 10.

{¶9} The trial court sentenced Nelson to an aggregate prison term of life with parole eligibility after 45 years: a prison term of life with parole eligibility after 25 years to be served consecutively with the three-year firearm specification on Count 2; a prison term of eight years to be served consecutively with the three-year firearm specification on Count 4; a prison term of eight years to be served consecutively with the three-year firearm specification on Count 9; a prison term of eight years to be served consecutively with the three-year firearm specification on Count 10; and a prison term of three years on Count 14. The trial court ordered Nelson to serve Counts 2 and 4 concurrently, and Counts 9, 10, and 14 concurrently.

{¶10} The trial court ordered the three-year firearm specifications charged in Counts 2, 4, 9, and 10 to run consecutively to one another, for a total of 12 years in prison, and consecutively to the eight-year concurrent sentence on Counts 9, 10, and 14; the trial court ordered the 12-year sentence for the firearm specifications to run concurrently with the prison term of life with parole eligibility after 25 years on Counts 2 and 4.

{¶11} On August 30, 2016, Nelson filed the instant appeal challenging his convictions and the trial court's sentence. He assigns five errors for review:

I. The state of Ohio failed to present sufficient evidence to support the trial court's convictions.

II. Nelson's convictions are against the manifest weight of the evidence.

III. Nelson was denied the effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution when his attorney failed to litigate a motion to suppress multiple illegally obtained statements of Nelson.

IV. Leadbetter's in court identification of Nelson was improper and prejudicial, violation Nelson's right to due process and a fair trial.

V. The twenty year consecutive sentence in this case was improper.

For ease of discussion, we will address Nelson's assignments of error out of order.

## II. Law and Analysis

### A. Identification

{¶12} In his fourth assignment of error, Nelson argues that Leadbetter's in-court identification of Nelson as the shooter was prejudicial and deprived him of his due process rights and a fair trial.

{¶13} "An identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process." *State v. Fields*, 8th Dist. Cuyahoga No. 99750, 2014-Ohio-301, ¶ 10, citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Generally, an in-court identification will be upheld "where the totality of the circumstances demonstrates that the in-court identification was reliable." *State v. Gales*, 8th Dist. Cuyahoga No. 102809, 2016-Ohio-588, ¶ 30, citing *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 58 (10th Dist.).

{¶14} This court has held that even if a pretrial identification procedure, such as a

photo array or a lineup, is impermissibly suggestive, an in-court identification is permissible if the state establishes by clear and convincing evidence that the witness had a reliable, independent basis for the identification based on prior independent observations made at the scene of the crime. *State v. Thomas*, 8th Dist. Cuyahoga No. 88548, 2007-Ohio-3522, ¶ 20; *State v. Jackson*, 8th Dist. Cuyahoga No. 88345, 2007-Ohio-2925, ¶ 43; *State v. Tate*, 8th Dist. Cuyahoga No. 81577, 2003-Ohio-1835, ¶ 24; *In re Henderson*, 8th Dist. Cuyahoga No. 79716, 2002 Ohio App. LEXIS 452 (Feb. 7, 2002). In *State v. Jackson*, 26 Ohio St.2d 74, 269 N.E.2d 118 (1971), the Ohio Supreme Court explained that in determining the admissibility of an in-court identification, trial courts should consider whether the in-court identification was a product of an improper pretrial identification procedure or whether the in-court identification "came from some independent recollection and observation of the accused by the witness." *Id*. at 77.

{¶15} In the instant matter, we initially note that Leadbetter identified Nelson in court as the shooter on multiple occasions. At no point did Nelson's trial counsel object to any of Leadbetter's in-court identifications. Therefore, we review for plain error. *See State v. Williams*, 8th Dist. Cuyahoga No. 101121, 2015-Ohio-172, ¶ 30. Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Notice of plain error "'is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), quoting *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

{¶16} It is undisputed that there was not a pretrial identification procedure during which Leadbetter identified Nelson as the shooter. Nevertheless, the record reflects that Leadbetter's in-court identifications were based on his own observations and memory.

{¶17} Leadbetter testified that Nelson was riding his bicycle and following him and Goins for five to ten minutes. Leadbetter stated that Nelson dismounted the bicycle, walked up to him and Goins, pointed a gun at them, and ordered them to turn over their belongings. Leadbetter testified that Goins drew his gun and, after Nelson opened fire, Nelson and Goins exchanged fire. Leadbetter explained that Goins was standing roughly three feet away from him when Nelson shot him. (Tr. 112.) Leadbetter asserted that Nelson left the area after shooting Goins. At this point, Leadbetter called 911 to report the incident. Leadbetter explained that Nelson returned to the area and began firing shots at him. As a result, he ran to his house, which was nearby.

{¶18} Based on Leadbetter's account of the incident, we find that he had sufficient opportunity to view the shooter during the incident. In fact, Leadbetter had three separate opportunities to view the shooter: (1) while the shooter was following him and Goins on his bicycle, (2) when the shooter dismounted his bicycle and approached him and Goins on foot, and (3) when the shooter returned to the area after shooting Goins and began firing shots at Leadbetter. On recross-examination, Leadbetter explained that when Nelson and Goins exchanged fire, Leadbetter's attention was focused on Nelson, not Nelson's gun. (Tr. 121.) Leadbetter confirmed that the person who killed Goins was the same person that had been following them on a bicycle.

{¶19} Leadbetter described the shooter as a black male, slightly taller than him,[2] wearing a "dark hoodie" and "regular" pants. (Tr. 53, 124-125.) He did not see any tattoos on the shooter and could not recall whether the shooter had facial hair. Leadbetter did not agree with defense counsel's statement that a hoodie "covers up a lot of the facial features of a person," explaining that a hoodie "doesn't cover the face." (Tr. 121.) Leadbetter asserted that the hoodie covered the shooter's hair, not the shooter's face. (Tr. 123.)

{¶20} Leadbetter's in-court identification was made under oath and subject to cross-examination. On cross-examination, defense counsel was able to elicit testimony regarding Leadbetter's alcohol consumption, his inability to describe the shooter to the 911 dispatcher, his statement to the 911 dispatcher that he did not see the shooter, the fact that it was dark at the time of the incident, the lack of street lighting at the location of the shooting, and Leadbetter's failure to inform the police or prosecution earlier that he could make an identification of the shooter. Furthermore, defense counsel was able to challenge Leadbetter's recollection of the incident.

{¶21} Leadbetter acknowledged that the police never showed him a photograph of Nelson in relation to the investigation and that he never identified Nelson as the shooter before trial. (Tr. 81.) Leadbetter conceded that he never called the police to tell them that he knew who the shooter was or that he could identify the shooter. (Tr. 92.) Defense counsel inquired about a mistake that Leadbetter made in reporting the location

---

[2] Leadbetter asserted that he is 5'10". (Tr. 122.)

of the shooting to the 911 dispatcher.   Leadbetter explained that he "was in shock from the situation."   (Tr. 98.)   Regarding defense counsel's concern about Leadbetter's inability to describe the shooter to either the 911 dispatcher or the responding officers, Leadbetter explained that "[e]ver since that night, every night and every day that situation plays back over and over again in my head."   (Tr. 68.)   Leadbetter testified that when he ran the scenario over and over in his head, he was able to see the shooter in his head and he could tell who the shooter was.   (Tr. 108.)

{¶22} Nelson asserts that the in-court identification was unduly suggestive and that "the only reason Leadbetter identified Nelson as the shooter was because [Nelson] was the [d]efendant in the orange jumpsuit sitting at the defense table[.]" Appellant's brief at 31.   On direct examination, Leadbetter confirmed that he was not identifying Nelson as the shooter merely because he was the only person in the courtroom wearing an orange jumpsuit.   (Tr. 53.)   On redirect examination, Leadbetter reinforced that he was not merely identifying Nelson as the shooter because he was wearing orange clothing and sitting at the defense table.   He insisted that he identified Nelson as the shooter because he recognized and remembered him, not because he wanted to make sure that Nelson was convicted.   (Tr. 109.)

{¶23} Based on the foregoing analysis, we find that Leadbetter had a reliable and independent basis for the identification based on his prior independent observations of the shooter at the scene of the crime.   We do not find that Leadbetter's in-court identification denied Nelson his right to a fair trial, nor that the trial court committed plain

error in permitting the identification. Accordingly, Nelson's fourth assignment of error is overruled.

## B. Sufficiency

{¶24} In his first assignment of error, Nelson argues that his convictions are not supported by sufficient evidence.

{¶25} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶26} First, Nelson argues that his aggravated murder conviction on Count 1, a violation of R.C. 2903.01(A), was not supported by sufficient evidence. R.C. 2903.01(A) provides in pertinent part that "no person shall purposely, and with prior calculation and design, cause the death of another[.]"

{¶27} Nelson argues that the state failed to demonstrate that he acted with prior calculation and design. In support of his argument, Nelson asserts that Goins opened fire first and, after a momentary deliberation, he decided to return fire. Nelson insists that this momentary deliberation during which he decided to return fire is insufficient to demonstrate that he acted with prior calculation and design.

{¶28} Initially, we note that Nelsons's assertion that Goins fired the first shot is

unsupported by the record. Leadbetter testified that Nelson fired the first shot: "[Nelson] shoots. [Goins] shoots. [Nelson] shoots again." (Tr. 55.)

{¶29} Prior calculation and design has been defined as "'the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means and/or instrument with which to cause the death of another.'" *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 13, quoting *State v. Coley*, 93 Ohio St.3d 253, 267, 754 N.E.2d 1129 (2001). Furthermore, the phrase indicates "'studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim.'" *State v. Powell*, 8th Dist. Cuyahoga No. 99386, 2014-Ohio-2048, ¶ 11, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997). Instantaneous deliberation is not sufficient to show prior calculation and design — the defendant must act consistent with "a scheme designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978).

{¶30} The Ohio Supreme Court has considered the following three factors in determining whether a defendant acted with prior calculation and design:

> (1) Did the accused and the victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or an almost spontaneous eruption of events?

*Taylor* at 19; *State v. Shabazz*, 8th Dist. Cuyahoga No. 100021, 2014-Ohio-1828, ¶ 26.

{¶31} In *State v. Jackson*, 92 Ohio St.3d 436, 441, 751 N.E.2d 946 (2001), the

defendant-appellant challenged the sufficiency of the evidence supporting his aggravated murder convictions. Specifically, appellant argued that there was insufficient evidence of prior calculation and design because the shooting was a spontaneous act and although there was a plan to rob, there was not a plan to kill. *Id*. at 441. The Ohio Supreme Court affirmed the aggravated murder convictions, concluding that the state presented sufficient evidence of prior calculation and design:

> [a]ppellant's decision to kill [the victims] was not a spur-of-the moment shooting, as appellant contends. Instead, *after completing the robbery*, appellant made the conscious decision to shoot the victims execution-style, realizing that the victims recognized him. Before shooting them, appellant took the time to retrieve a pillow from the couch and place it behind each victim's head. Appellant then hesitated, and finally pulled the trigger.

(Emphasis added.) *Id*.

{¶32} In the instant matter, the record reflects that Goins was shot during Nelson's attempt to rob Goins and Leadbetter. Leadbetter testified that Nelson opened fire *after* Goins drew his gun. Nelson did not fire shots at Leadbetter and Goins from his bicycle, nor did he open fire when he initially approached them on foot and ordered them to hand over their belongings. Nelson only fired his weapon after Goins drew his gun and pointed it at Nelson. Unlike *Jackson*, Nelson had not completed the robbery nor obtained any of Leadbetter's or Goins's belongings before the shooting occurred.

{¶33} Applying the *Taylor* factors, Leadbetter testified that he did not know Nelson and that he had never seen him before the day of the incident. (Tr. 109.) There is no evidence in the record indicating that Nelson gave thought or consideration in choosing the murder weapon and murder site. Finally, the killing resulted from a

spontaneous eruption of events.

**{¶34}** Accordingly, the evidence adduced at trial demonstrates that when Nelson approached Leadbetter and Goins, his plan was to rob them. When Goins drew his weapon and pointed it at Nelson, Nelson made a spur-of-the moment decision to shoot Goins. Thus, Nelson's conviction for aggravated murder under R.C. 2903.01(A) was not supported by sufficient evidence. There was, however, sufficient evidence that Nelson committed aggravated murder in violation of R.C. 2903.01(B), murder in violation of R.C. 2903.02(B), and aggravated robbery.

**{¶35}** Aggravated murder, in violation of R.C. 2903.01(B), provides in pertinent part, "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit * * * aggravated robbery[.]" Murder, in violation of R.C. 2903.02(B), provides in pertinent part, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" Aggravated robbery, in violation of R.C. 2911.01(A), provides in pertinent part:

> No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
>
> * * *
>
> (3) Inflict, or attempt to inflict, serious physical harm on another.

**{¶36}** In his manifest weight analysis, Nelson raises a sufficiency argument regarding his convictions for aggravated murder, murder, and aggravated robbery. Nelson contends that "the weight of the evidence does not support a theft offense and consequently all of the charges, ultimately dependent in this case upon the existence of an underlying theft, should be vacated accordingly. The [s]tate of Ohio failed to establish a theft from [Nelson] occurred beyond a reasonable doubt." Appellant's brief at 25. In support of his argument, Nelson emphasizes that no stolen property was recovered from the scene and that Goins's wallet, backpack, and the contents in his backpack were recovered from his person at the scene. Although Nelson acknowledges that Goins's gun was missing from his holster, he asserts that the state did not present any evidence that he took the gun. We disagree. The record reflects that the state presented sufficient eyewitness testimony and circumstantial evidence to establish that Nelson committed or attempted to commit the offense of aggravated robbery.

**{¶37}** As noted above, Leadbetter testified that Nelson approached him and Goins, held them at gunpoint, and ordered them to turn over their belongings. Leadbetter further testified that Goins drew his gun and that Nelson and Goins exchanged fire. According to Leadbetter's version of the events, there were two guns at the scene.

**{¶38}** Detective James Kooser, a firearm examiner with the Cleveland Police Department, testified that cartridge cases from two different weapons — a .40-caliber Glock and a 9 mm Glock — were recovered at the crime scene. Detective Kooser confirmed that "there were two firearms [at the scene] from the evidence I have. There

was a 9 mm Glock and a .40-caliber Glock." (Tr. 190.)

**{¶39}** Detective Kevin Fischbach from the Cleveland Police Department's Homicide Unit, testified that at the scene of the shooting, officers recovered one .40-caliber shell casing from a Glock and nine shell casings from a 9 mm Glock. (Tr. 482.) Detective Fischbach explained that the casings were fired by two different guns.

**{¶40}** Detective Fischbach stated that he interviewed Leadbetter and learned that both the shooter and Goins were carrying guns. Detective Fischbach asserted that officers did not recover Goins's gun at the scene, they only found an empty holster on Goins's right hip. (Tr. 467.) Homicide Detective James Raynard testified that officers retrieved a receipt from Goins's wallet indicating that Goins purchased a .40-caliber Glock on March 16, 2015. (Tr. 413.)

**{¶41}** Despite the evidence indicating that two guns had been fired at the crime scene, the responding officers did not recover a gun at the scene. Leadbetter testified that Nelson fled the area after shooting Goins and firing shots at him. Furthermore, Nelson was not apprehended immediately following the shooting. As explained in further detail below, officers did not speak with Nelson at the hospital until more than one hour after the shooting. Thus, an inference could be made that Nelson took Goins's gun before fleeing the scene and either discarded or abandoned his gun and Goins's gun before seeking treatment for his gunshot wound at University Hospitals.

**{¶42}** The state presented the testimony of Angelo Caraballo, a resident in the area where the shooting took place. He testified that after hearing two or three gunshots, he

got out of bed, looked out his window, and saw a person "with a hoodie on and he's bending over and he had a gun in his hand and he was bending over. I thought he was, like, picking up a shell casing, shells and stuff like that." (Tr. 154.) Caraballo stated that there was a bike at the scene and that it was right behind the person wearing the hoodie and carrying a gun. He explained that after a while, the person "picked up the bike, then he set it on the fence next to my house." (Tr. 155.) Christine Scott, a DNA analyst from the Cuyahoga County Medical Examiner's Office, testified that DNA testing was conducted on the bicycle recovered at the scene, and that Nelson's DNA matched the major DNA components from the bicycle's handlebars. Officers also recovered a cellphone in the street on Lakeview Road. Scott testified that DNA was conducted on the cellphone, and that Nelson's DNA matched the major DNA component from the cellphone.

{¶43} As noted above, shell casings from two different firearms were recovered at the scene. Thus an inference could be made that when Caraballo observed the shooter bending over and picking something up off the ground, he was picking up Goins's gun rather than spent shell casings.

{¶44} Accordingly, Nelson's convictions for aggravated murder, in violation of R.C. 2903.01(B), murder, and aggravated robbery are supported by sufficient evidence. The aforementioned eyewitness testimony of Leadbetter and Caraballo and circumstantial evidence, if believed, supports the state's theory that Nelson fled the scene with Goins's gun. Assuming, arguendo, that Nelson did not steal Goins's gun, nor any other of

Leadbetter's or Goins's belongings, the state presented sufficient evidence demonstrating that Nelson attempted to do so.

**{¶45}** Finally, although he does not specifically challenge his conviction for having weapons while under disability, Nelson argues that the state failed to demonstrate that he possessed a weapon at the time of the incident. Leadbetter testified that Nelson was carrying a gun and that he pointed it at him and Goins after dismounting his bicycle. Leadbetter's testimony alone, if believed, is sufficient to establish that Nelson was, in fact, in possession of a weapon.

**{¶46}** Based on the foregoing analysis, Nelson's first assignment of error is sustained in part and overruled in part. Nelson's conviction for aggravated murder under R.C. 2903.01(A) was not supported by sufficient evidence, and thus is vacated. Nelson's remaining convictions are supported by sufficient evidence.

### C. Manifest Weight

**{¶47}** In his second assignment of error, Nelson argues that his convictions are against the manifest weight of the evidence.

**{¶48}** In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, at ¶ 12. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*Thompkins*, 78 Ohio St.3d at 388, 678 N.E.2d 541. A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶49} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶50} In support of his manifest weight challenge, Nelson asserts that Leadbetter's in-court identification and trial testimony were not credible. Specifically, Nelson contends that Leadbetter was neither a credible nor reliable witness because he was "very intoxicated" when the shooting took place.

{¶51} On direct examination, Leadbetter acknowledged that he had been drinking before the shooting, but did not consider himself to be drunk. (Tr. 68.) On cross-examination, Leadbetter testified that Cleveland police detectives picked him up at

his house after the shooting. He stated that he was not intoxicated when the officers picked him up, and explained that he "stopped feeling the intoxication" around 4:00 or 5:00 a.m. (Tr. 77.) On recross-examination, Leadbetter agreed with defense counsel's statement that at the time of the incident, he was "somewhat intoxicated, [but] not highly intoxicated[.]" (Tr. 120.)

{¶52} Leadbetter's testimony about the sequence of the events was corroborated by the physical evidence. As noted above, officers recovered casings from two different firearms at the crime scene, supporting Leadbetter's account that both Goins and Nelson had a gun and that the two exchanged fire. Leadbetter's testimony that the person riding the bicycle killed Goins was also corroborated by the testimony of Caraballo and Scott. DNA testing was conducted on the bicycle that was left behind by the individual Caraballo observed carrying a gun. Scott testified that Nelson's DNA profile matched the major DNA components collected from the bicycle's handlebars.

{¶53} Nelson's theory of defense at trial was that he, Leadbetter, and Goins were victims of a drive-by shooting. On the other hand, the state's theory of the case was that Nelson murdered Goins and fired shots at Leadbetter after attempting to rob them. Nelson suggests that the evidence presented at trial supports his theory rather than the state's. Specifically, Nelson emphasizes that his gunshot residue test was negative, while Leadbetter and Goins both tested positive for gunshot residue.

{¶54} Daniel Mabel, a forensic scientist with the Cuyahoga County Medical Examiner's Office, testified that Nelson's hands were tested for gunshot residue and that

neither hand contained gunshot residue particles. (Tr. 297.) However, Mabel explained that the fact that a person does not have gunshot residue on them does not necessarily mean that they did not fire a gun:

> gunshot residue can very easily be removed or washed away. The lack of gunshot residue on somebody's hands doesn't necessarily mean that they didn't fire a gun. It has a lot to do with the time between the firing of the gun and when the samples were collected, what the activities of the shooter may have been.

(Tr. 298.) Mabel asserted that it is important to collect gunshot residue samples close in time to when the gun is fired: "[g]unshot residue, like a lot of trace evidence, is very easily removed or very easily destroyed or washed away by anything from outdoor elements, like the wind, or just putting your hand in your pocket or any sort of action like that could very easily remove the gunshot residue." (Tr. 277.) Mabel testified that his case file did not indicate when the gunshot residue samples were collected from Nelson.

{¶55} As noted above, Nelson was not apprehended by the responding officers immediately after the shooting. Cleveland police officer Frederick Young testified that he responded to the crime scene and set up a perimeter, taped off the scene, and helped secure the evidence. (Tr. 305.) He testified that he was at the crime scene for "[a]t least an hour. We were over there an hour, maybe a little more than an hour[.]" (Tr. 305.) Officer Young asserted that he received a radio call ordering him to respond to University Hospitals to investigate a male being treated for a gunshot wound. He identified Nelson as the person who was treated for a gunshot wound.

{¶56} Accordingly, although Nelson did not test positive for gunshot residue, the

trial court was able to consider that officers did not come into contact with Nelson until more than one hour after the shooting. During this time, any gunshot residue particles on Nelson could have been removed or washed away — either deliberately or inadvertently.

{¶57} The record does not support Nelson's theory that he was a victim of a drive-by shooting. When Officer Young spoke with Nelson at the hospital, Nelson stated that a van had been following him as he was riding his bicycle home. Nelson alleged that an occupant inside the van started shooting at him, Goins, and Leadbetter. Leadbetter testified that there was not a van on the street when the shooting occurred. He insisted that he, Goins, and Nelson were the only people out on the street when the shooting occurred.

{¶58} After reviewing the record, we cannot say that this is "an exceptional case" in which the trial court clearly lost its way and created such a manifest miscarriage of justice that Nelson's convictions were against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Nelson's convictions are not against the manifest weight of the evidence simply because the trial court chose to believe the state's version of the events rather than Nelson's theory. The trial court, as the trier of fact, had sufficient information, and was in the best position to weigh the credibility of the witnesses. Furthermore, the trial court "was free to believe all, part, or none of the testimony of each witness." *State v. Colvin*, 10th Dist. Franklin No. 04AP-421, 2005-Ohio-1448, ¶ 34; *State v. Smith*, 8th Dist. Cuyahoga No. 93593, 2010-Ohio-4006, ¶

16.

{¶59} Based on the foregoing analysis, Nelson's second assignment of error is overruled.

### D. Ineffective Assistance of Counsel

{¶60} In his third assignment of error, Nelson argues that he was denied his Sixth Amendment right to effective assistance of counsel.

{¶61} Reversal of a conviction for ineffective assistance of counsel requires a defendant to show that (1) counsel's performance was deficient, i.e., performance falling below an objective standard of reasonable representation, and (2) the deficient performance prejudiced the defense, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Accord State v. Edmonds*, 8th Dist. Cuyahoga No. 104528, 2017-Ohio-745, ¶ 21. The failure to prove either prong of the *Strickland* two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland* at 697.

{¶62} In evaluating a claim of ineffective assistance of counsel, a court must give great deference to counsel's performance. *Strickland* at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Pawlak*, 8th

Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

**{¶63}** In the instant matter, Nelson argues that his trial counsel provided ineffective assistance by failing to file a motion to suppress the statements Nelson made to officers at the hospital and the homicide unit. Nelson asserts that both interviews constituted custodial interrogations and that the officers did not read him his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). On the other hand, the state contends that Nelson's statements "were voluntary in nature and not made during custodial interrogation[s.]" Appellee's brief at 25. After reviewing the record, we agree with the state.

**{¶64}** The failure to file a motion to suppress is not per se ineffective assistance of counsel. *Madrigal*, 87 Ohio St.3d at 389, 721 N.E.2d 52. As explained in *State v. Moon*, 8th Dist. Cuyahoga No. 101972, 2015-Ohio-1550,

> the failure to file a motion to suppress constitutes ineffective assistance of counsel *only when the record demonstrates that the motion would have been successful if made.* Even if some evidence in the record supports a motion to suppress, counsel is still considered effective if counsel could reasonably have decided that filing a motion to suppress would have been a futile act.

(Emphasis added.) *Id*. at ¶ 28.

**{¶65}** Nelson argues that he "was the suspect in this investigation from the time police were informed over dispatch that an individual with a gunshot wound was admitted to a hospital less than one mile from the homicide[.]" Appellant's brief at 27. Nelson's argument, however, is not supported by the record.

**{¶66}** Officer Young testified that he responded to University Hospitals and

"conducted an interview to find out the circumstances of *why — how [Nelson] was injured*." (Emphasis added.) (Tr. 306.) Officer Young stated that he was asked to stay at the hospital with Nelson until homicide detectives arrived to speak with him.

{¶67} Detective Fischbach testified that while officers were at the scene of the shooting on Lakeview Road, they learned that there was "a victim of a gunshot wound at University Hospital[s] from the same location." (Tr. 472.) Detective Fischbach explained that officers believed the individual at the hospital may have been a third victim. Detective Fischbach stated that he went to the hospital and had "an informative type of conversation" with Nelson. (Tr. 474.) Detective Fischbach asserted that Nelson appeared to be a victim rather than a suspect, and the officers asked Nelson to tell them what happened. This conversation took place in the hospital's emergency department. During this conversation, Nelson stated that he was heading north bound on Lakeview Road and that a van or minivan was following him,

> [a]s he approached farther north on Lakeview [Road] he noticed two males[, Leadbetter and Goins,] walking on the east side of Lakeview [Road] also heading northbound. Since [Nelson] was scared about the van that was following him, he decided to try and meet up with the two individuals walking on the sidewalk so that it looked like they were a party of three and he would be less likely to become a victim of a crime.

(Tr. 474-475.)

{¶68} Nelson stated that "as he was getting closer to the males on the sidewalk someone from the van or minivan started shooting a gun out the window at him. He then stated he fell off his bicycle and * * * just kept running until he reached his mother's home." (Tr. 475.) Nelson told Detective Fischbach that shots were fired from one gun

inside the van.

{¶69} Nelson further asserts that the officers "did not allow [him] to leave the hospital once he was discharged and instead took him down to the [h]omicide [u]nit" for further interrogation. Appellant's brief at 28. This argument is also belied by the record.

{¶70} Nelson was released from the hospital after receiving medical treatment for his gunshot wound. Detective Fischbach stated that Nelson "was seen by the doctor, they took x-rays, [and] he was released earlier that morning." (Tr. 477.) Detective Fischbach testified that after Nelson was released from the hospital, "[w]e *asked* him to come down to the homicide unit to give a statement *in connection with the incident that happened to his foot*." (Emphasis added.) (Tr. 477.) Fischbach asserted that Nelson agreed to come to the homicide unit and that he provided a voluntary statement to the officers, which was videotaped. (Tr. 477.) During this statement, Nelson "reiterated the same story" about a drive-by shooting involving a van. (Tr. 478.) Detective Fischbach explained that when officers confronted Nelson with evidence recovered from the scene that contradicted his account of the incident, "[Nelson] referred back to his original information that he was being followed by the [van]. At first he became irritated, but then just quit talking." (Tr. 479.) As a result, Fischbach consulted with his supervisor, arrested Nelson in connection with the shooting, and read Nelson his constitutional rights.

{¶71} On cross-examination, Detective Fischbach acknowledged that officers gave

Nelson a ride from the hospital to the homicide unit. Detective Fischbach confirmed that Nelson was not under arrest when he was discharged from the hospital and that he could have refused to go down to the homicide unit. Detective Fischbach asserted that officers asked Nelson to come to the homicide unit, and that Nelson was not under arrest when officers gave him a ride from the hospital. Detective Fischbach explained that if Nelson had been placed under arrest or detained when the officers brought him to the homicide unit, Nelson would have been *Mirandized*. Finally, Detective Fischbach verified that when officers spoke with Nelson at the hospital, they were just inquiring and trying to learn what had transpired.

{¶72} After reviewing the record, we find no merit to Nelson's ineffective assistance of counsel claim regarding trial counsel's failure to file a motion to suppress the statements he made to the police at the hospital and the homicide unit. Nelson's statements were not incriminating. He made no confession to the crimes committed against Goins and Leadbetter and insisted that he was a victim of a drive-by shooting. Nelson was not subject to a custodial interrogation — either at the hospital or the homicide unit. There was no evidence that Nelson was handcuffed at the hospital nor that the officers ordered or demanded Nelson to accompany them to the homicide unit. Furthermore, Nelson's statements to the police were voluntary. "Miranda does not affect the admissibility of 'volunteered statements of any kind.'" *State v. Duhamel*, 8th Dist. Cuyahoga No. 102346, 2015-Ohio-3145, ¶ 24, quoting *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶73} At the hospital, the officers engaged in informative and inquisitive conversations with Nelson during which they sought to determine how he sustained the gunshot wound to his foot. The officers did not conduct accusatorial interviews nor question Nelson about the murder of Goins and attempted murder of Leadbetter. The record reflects that the officers reasonably believed that Nelson was a victim rather than a suspect.

{¶74} We take note of the facts that officers stayed with Nelson at the hospital and gave him a ride to the homicide unit after he was released. However, there is nothing in the record indicating that Nelson was required or ordered to accompany the officers to the police station — the officers asked him to give a statement at the police station, and he voluntarily agreed to do so.

{¶75} We further note that either during or after Nelson provided his voluntary statement at the homicide unit, officers confronted Nelson with evidence that contradicted his statement. However, Detective Fischbach explained that the confrontation pertained to the route that Nelson took when he ran from the scene of the shooting to his mother's house on Locke Avenue and the people that Nelson was planning to meet at the time the alleged drive-by shooting occurred. There is no evidence that the officers specifically challenged Nelson's assertion that he was a victim. Nevertheless, when Nelson's voluntary participation in the conversation ceased, the record reflects that the officers terminated the interview.

{¶76} Accordingly, even if Nelson's counsel had moved to suppress the statements

he made at the hospital and homicide unit, we cannot say that the motion would have been successful based on the record before this court. Furthermore, as detailed above in the sufficiency and manifest weight analysis, the state presented ample evidence of Nelson's involvement in the shooting that is independent of these statements.

{¶77} Nelson further asserts that trial counsel's failure to object to Leadbetter's in-court identifications of Nelson as the shooter constituted deficient performance. "The failure to do a futile act cannot be the basis for a claim of ineffective assistance of counsel, nor could such a failure be prejudicial." *State v. Knox*, 8th Dist. Cuyahoga Nos. 98713 and 98805, 2013-Ohio-1662, ¶ 20, citing *State v. Ford*, 8th Dist. Cuyahoga Nos. 88946 and 88947, 2007-Ohio-5722, ¶ 9. As noted above, there is nothing in the record indicating that Leadbetter's identifications were unreliable. Thus, an objection to the identifications would have been denied.

{¶78} Based on the foregoing analysis, Nelson's third assignment of error is overruled.

### E. Consecutive Sentences

{¶79} In his fifth assignment of error, Nelson argues that it was improper for the trial court to impose consecutive three-year sentences on the three-year firearm specifications underlying Nelson's convictions for aggravated murder, aggravated robbery, and aggravated robbery. The record reflects that the trial court also imposed a consecutive three-year sentence on the three-year firearm specification underlying Nelson's attempted murder conviction.

**{¶80}** Nelson acknowledges that this court has previously held that R.C. 2929.14(B)(1)(g) "allow[s] for multiple, consecutive firearm specifications to be imposed for a single incident." *See, e.g., State v. Lawrence*, 8th Dist. Cuyahoga Nos. 100371 and 100387, 2014-Ohio-4797, ¶ 12-16. Nevertheless, Nelson asks this court to "consider the equities of imposing multiple firearm convictions for a single act." Appellant's brief at 32. Furthermore, Nelson asserts that at the very least, the trial court "should be required to undertake consecutive sentencing analysis and justification (using R.C. 2929.14(C)(4)) before imposing consecutive firearm specifications for the unusual statutory 'exception' carved out in [R.C.] 2929.14(B)(1)(b), a statute that does mention consecutive sentencing." Appellant's brief at 32. This court has already considered and rejected these arguments. *See State v. Nitsche*, 8th Dist. Cuyahoga No. 103174, 2016-Ohio-3170, ¶ 50-55; *State v. Young*, 8th Dist. Cuyahoga No. 102202, 2015-Ohio-2862, ¶ 10; *Lawrence* at ¶ 14; *State v. Vanderhorst*, 8th Dist. Cuyahoga No. 97242, 2013-Ohio-1785, ¶ 10.

**{¶81}** Pursuant to R.C. 2929.14(B)(1)(b), a trial court is ordinarily prohibited from imposing more than one prison term for firearm specifications associated with felonies "committed as part of the same act or transaction." R.C. 2929.14(B)(1)(g), however, contains an exception to this general rule and provides

> [i]f an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall

impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

This court has construed R.C. 2929.14(B)(1)(g) to mean that in cases like the instant matter, where Nelson was found guilty of two or more felonies, including aggravated murder, aggravated robbery, and attempted murder, and the felony counts contained firearm specifications, the trial court is required to impose prison terms for the two most serious specifications and also has discretion to impose a sentence for any other specification. *Nitsche* at ¶ 53; *State v. James*, 2015-Ohio-4987, 53 N.E.3d 770, ¶ 41 (8th Dist.). This court has further stated that although the General Assembly did not use the word "consecutive" in R.C. 2929.14(B)(1)(g), the statute did, in fact, create an exception to the general rule that a trial court may not impose multiple, consecutive firearm specifications for crimes committed as part of the same act or transaction. *Nitsche* at ¶ 53, citing *Young* at ¶ 9, and *Vanderhorst* at ¶ 10.

> "The mandatory language of the statute ('the court shall impose') also indicates the General Assembly's intention that the defendant serve multiple sentences for firearm specifications associated with the enumerated crimes, such as [aggravated murder, attempted murder, and aggravated robbery]. Had the legislature intended a per se rule that sentences for firearm specifications must be served concurrent with one another, it could have stated as much. Or, the legislature could have chosen not to codify R.C. 2929.14(B)(1)(g), which serves as an exception to the rule that multiple firearm specifications must be merged for purposes of sentencing when the predicate offenses were committed as a single criminal transaction."

*Young* at ¶ 9, quoting *Vanderhorst* at ¶ 10, quoting *State v. Isreal*, 12th Dist. Warren No. CA2011-11-115, 2012-Ohio-4876, ¶ 71; *see also Lawrence* at ¶ 14.

{¶82} In the instant matter, aside from his conviction and sentence for having weapons while under disability, Nelson was convicted of and sentenced for aggravated murder, attempted murder, and two counts of aggravated robbery. Each of these counts contained one-year firearm specifications pursuant to R.C. 2941.141(A) and three-year firearm specifications pursuant to R.C. 2941.145(A). The trial court found Nelson guilty of these underlying firearm specifications. Thus, the trial court was mandated by R.C. 2929.14(B)(1)(g) to impose sentences "for each of the two most serious specifications of which [Nelson] was convicted" — two of the four three-year firearm specifications — consecutively. *See Nitsche* at ¶ 54. In addition to this mandatory sentence, the trial court had discretion to impose, and did in fact impose, consecutive three-year sentences on the remaining two three-year firearm specifications.

{¶83} Nelson does not specify whether he is challenging the trial court's mandatory imposition of consecutive sentences for the first and second three-year firearm specifications, the discretionary imposition of consecutive sentences for the third and fourth three-year firearm specifications, or both. Nevertheless, we find no merit to Nelson's argument that the trial court should be required to make consecutive sentence findings under R.C. 2929.14(C)(4) before ordering consecutive service of firearm specifications.

{¶84} This court has held that because R.C. 2929.14(B)(1)(g) requires trial courts to order consecutive service of certain specifications, a trial court is not required to make R.C. 2929.14(C)(4) findings before imposing the multiple and consecutive three-year

sentences on the first two firearm specifications. *Nitsche*, 8th Dist. Cuyahoga No. 103174, 2016-Ohio-3170, at ¶ 54, citing *Young*, 8th Dist. Cuyahoga No. 102202, 2015-Ohio-2862, at ¶ 10, and *State v. A.H.*, 8th Dist. Cuyahoga No. 98622, 2013-Ohio-2525, ¶ 21. "[T]he mandatory requirement to order consecutive service of certain specifications under R.C. 2929.14(B)(1)(g) supersedes the findings required by R.C. 2929.14(C)(4)." *James*, 2015-Ohio-4987, 53 N.E.3d 770, at ¶ 46. *Accord Nitsche* at ¶ 54.

{¶85} This court has not, however, specifically addressed whether the discretionary imposition of multiple and consecutive sentences for the third and fourth three-year firearm specifications should be treated similarly to the mandatory requirement to order consecutive service of the first and second firearm specifications. *See James* at ¶ 46. In *James*, this court held that a trial court has no obligation under R.C. 2929.14(B)(1)(g) to make any findings before ordering consecutive service of a third specification:

> There are several appellate decisions addressing whether the court abused its discretion by ordering consecutive service of a third specification under R.C. 2929.14(B)(1)(g), but none of them consider whether the sentencing judge had to make the findings required by R.C. 2992.14(C)(4). *See, e.g.*, [*Vanderhorst*, 8th Dist. Cuyahoga No. 97242, 2013-Ohio-1785]; *State v. Fortune*, 11th Dist. Lake No. 2014-L-117, 2015-Ohio-4019, 42 N.E.3d 1224; *State v. Isreal*, 12th Dist. Warren No. CA2011-11-115, 2012-Ohio-4876.

> The consecutive sentencing statute applies to "multiple prison terms [that] are imposed on an offender for convictions of multiple *offenses*[.]" (Emphasis sic.) R.C. 2929.14(C)(4). A specification is a sentencing enhancement, not a separate criminal offense, *State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, 945 N.E.2d 498, ¶ 16. By its own terms, R.C.

2929.14(C)(4) does not apply to penalty enhancing specifications. R.C. 2929.14(B)(1)(g) specifically applies to penalty enhancing specifications, so this statute controls. With there being no requirement in R.C. 2929.14(B)(1)(g) for the court to make findings of any kind before ordering a third penalty enhancing specification to be served consecutively, the court had no obligation to make any findings.

*James* at ¶ 46-47.

**{¶86}** Accordingly, the trial court did not err in imposing consecutive sentences for the three-year firearm specifications on Nelson's aggravated murder, attempted murder, and aggravated robbery counts. Furthermore, the trial court had no obligation to make findings of any kind, including the R.C. 2929.14(C)(4) consecutive sentence findings, before ordering Nelson to serve the three-year firearm specifications consecutively.

**{¶87}** Finally, Nelson suggests that he was punished for refusing to plead guilty and exercising his right to a trial. Nelson fails to identify any evidence in the record that suggests that the trial court imposed a vindictive or retaliatory sentence because he exercised his right to trial. *See* App.R. 16(A)(7).

**{¶88}** Based on the foregoing analysis, Nelson's fifth assignment of error is overruled.

### III. Conclusion

**{¶89}** After thoroughly reviewing the record, we find that Nelson's conviction on Count 1 for aggravated murder in violation of R.C. 2903.01(A) is not supported by sufficient evidence. Accordingly, we vacate this conviction. Because the trial court merged Counts 1, 2, 3, 6, and 7 for sentencing purposes, and sentenced Nelson on Count 2, we need not remand the matter for resentencing.

{¶90} Nelson's remaining convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Nelson was not denied his constitutional right to effective assistance of counsel. The trial court did not commit plain error by permitting Leadbetter's in-court identifications of Nelson as the shooter. Finally, the trial court did not err in imposing consecutive sentences for the three-year firearm specifications underlying Counts 2, 4, 9, and 10.

{¶91} Judgment affirmed in part and vacated in part.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed in part, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


FRANK D. CELEBREZZE, JR., JUDGE

EILEEN T. GALLAGHER, J., CONCURS;
MARY EILEEN KILBANE, P.J., CONCURS IN PART AND DISSENTS IN PART (WITH SEPARATE OPINION)

MARY EILEEN KILBANE, P.J., CONCURRING IN PART AND DISSENTING IN PART:

{¶92} I concur with the majority's resolution of Nelson's second, third, fourth, and

fifth assignments of error. I respectfully dissent, however, from the majority's conclusion in the first assignment of error that there is insufficient evidence in the record to support Nelson's conviction for aggravated murder under R.C. 2903.01(A).

{¶93} The facts demonstrate that Nelson followed Leadbetter and Goins on his bicycle for approximately ten minutes before he approached them. Leadbetter turned around and noticed that Nelson got off his bicycle and was approaching them with his gun pointed. He told them to give up everything. When Goins did not cooperate with Nelson's orders and pulled out his own gun, Nelson shot Goins in the head. Goins then fired his gun at Nelson. Nelson ran down an alleyway, but then returned to shoot at Leadbetter, who was on the phone with 911. After Leadbetter ran away, Nelson took Goins's gun from the scene.

{¶94} Based on these facts, I would find evidence of prior calculation by Nelson. Nelson left his house on the day in question carrying a loaded gun. He got on his bicycle and rode behind his victims for awhile before he approached them with his loaded gun out and pointed at both victims. He then killed Goins with a gunshot to the head and came back to shoot at Leadbetter and take Goins's gun. These actions were deliberate and well planned, not instantaneous.

{¶95} For these reasons, I would overrule Nelson's first assignment of error.